[No. 27164.  *En Banc.*  July 29, 1938.]

THE PACIFIC TELEPHONE AND TELEGRAPH COMPANY, *Respondent*, v. H. H. HENNEFORD *et al., as State Tax Commissioners, Appellants.*[1]

*The Attorney General* and *R. G. Sharpe, Assistant,* for appellants.

*McMicken, Rupp & Schweppe,* for respondent.

*Post, Russell, Davis & Paine, amicus curiae.*

[1]Reported in 81 P. (2d) 786.

MILLARD, J.—This appeal is from a decree of the Thurston county superior court permanently enjoining defendant tax commissioners from collecting from plaintiff a tax for the privilege of using within this state personal property purchased without this state and brought into this state and used herein indiscriminately and in common for the conduct of plaintiff's intermingled intrastate and interstate telephone and telegraph business, rendered upon defendant's refusal to plead further after a demurrer to the complaint had been overruled.

That portion of the revenue act pertinent to this appeal is Title 4, chapter 180, Laws of 1935, p. 726, and Title 4, chapter 180, Laws of 1935, p. 726, as amended by chapter 191, Laws 1937, p. 943, Rem. Rev. Stat. (Sup.), § 8370-31 [P. C. § 7030-91] *et seq.*, reading as follows:

"TITLE IV. COMPENSATING TAX.

"Sec. 31. There is hereby levied and there shall be collected from every person in this state a tax or excise for the privilege of using within this state any article of tangible personal property purchased subsequent to April 30, 1935. Such tax shall be levied and collected in an amount equal to the purchase price paid by the taxpayer multiplied by the rate of 2% [p. 726].

"Sec. 32. The provisions of this title shall not apply:

"(a) In respect to the use of any article of tangible personal property brought into the State of Washington by a non-resident thereof for his or her use or enjoyment while within the state;

"(b) In respect to the use of tangible personal property purchased other than at retail;

"(c) In respect to the use of any article of tangible personal property the sale or use of which has already been subjected to a tax equal to or in excess of that imposed by this title whether under the laws of this state or of some other state of the United States;

"(d) In respect to the use of tangible personal property purchased during any calendar month, the total

purchase price of which is less than twenty ($20.00) dollars [p. 726].

"Sec. 33. If any article of tangible personal property has already been subjected to a tax by this or any other state in respect to its sale or use in an amount less than the tax imposed by this title, the provisions of this title shall apply, but at a rate measured by the difference only between the rate herein fixed and the rate by which the previous tax upon the sale or use was computed [p. 727].

"Sec. 34. Each taxpayer subject to the provisions of this title shall, on or before the fifteenth day of every calendar month, file a return with the commission showing in detail the total quantity of tangible personal property used by him within the state during the preceding calendar month subject to the tax herein imposed, and such other information as the commission may deem pertinent. Each taxpayer shall remit to the commission with each such return the amount of tax shown thereon to be due [p. 727].

"Sec. 35. For the purposes of this title:

"(a) The term 'purchase price' shall mean the consideration paid or given or contracted to be paid or given by any person to the seller of an article or tangible personal property for the article purchased. The term shall include, in addition to the consideration paid or given or contracted to be paid or given, the actual cost of transportation from the place where the article was purchased to the person using the same in this state.

"(b) The meaning ascribed to words and phrases in titles II and III and all the provisions of title XVIII of this act, in so far as applicable, shall have full force and effect with respect to taxes imposed under the provisions of this title: *Provided, however,* That in applying the provisions of section 202, the warrant shall direct the sheriff to levy upon and sell only the personal property the use of which is subject to tax under this title, and the lien therein provided for shall attach only to such property [p. 727]." Laws of 1935, chapter 180, p. 726.

"Section 1. Section 31 of chapter 180 of Session

Laws of 1935 (8370-31, Remington's Revised Statutes), be and the same hereby is amended to read as follows:

"Section 31. From and after the first day of May, 1935, there is hereby levied and there shall be collected from every person in this state a tax or excise for the privilege of using within this state any article of tangible personal property purchased at retail or produced or manufactured for commercial use. This tax will not apply with respect to the use of any article of tangible personal property purchased, produced or manufactured outside this state until the transportation of such article has finally ended or until such article has become commingled with the general mass of property of this state. Such tax shall be levied and collected in any amount equal to the value of the article used by the taxpayer multiplied by the rate of two per cent [p. 943]. [Rem. Rev. Stat. (Sup.), § 8370-1 (P. C. § 7030-91).]

"Sec. 2. Section 32 of chapter 180 of Session Laws of 1935 (8370-32, Remington's Revised Statutes) be and the same hereby is amended to read as follows:

"Section 32. The provisions of this title shall not apply:

"(a) In respect to the use of any article of tangible personal property brought into the State of Washington by a non-resident thereof for his or her use or enjoyment while temporarily within the state unless such property is used in conducting a non-transitory business activity within the state;

"(b) In respect to the use of any article of tangible personal property if the sale thereof has already been subjected to tax under title III of this act and such tax has been paid by the purchaser;

"(c) In respect to the use of any article of tangible personal property purchased at retail the sale of which would have been specifically exempt from the tax imposed under title III of this act had the sale thereof been made within the state;

"(d) In respect to the use of tangible personal property put to use during any bi-monthly period, the total value of which is less than fifty ($50.00) dollars;

"(e) In respect to the use of rolling stock or aircraft or floating equipment of a common carrier, the

first use of which within the state is actual use in conducting interstate or foreign commerce [p. 944]. [Rem. Rev. Stat. (Sup.), § 8370-32 (P. C. § 7030-92).]

"Sec. 3. Section 34 of chapter 180 of Session Laws of 1935 (8370-34, Remington's Revised Statutes) be and the same hereby is amended to read as follows:

"Section 34. Each taxpayer subject to the provisions of this title shall, on or before the fifteenth day of the month succeeding the end of the bi-monthly period in which the tax accrued, file a return with the commission showing in detail the total quantity of tangible personal property used by him within the state during the preceding bi-monthly period subject to the tax herein imposed, and such other information as the commission may deem pertinent. Each taxpayer shall remit to the commission with each such return the amount of tax shown thereon to be due [p. 944]. [Rem. Rev. Stat. (Sup.), § 8370-34 (P. C. § 7030-94).]

"Sec 4. Section 35 of chapter 180 of Session Laws of 1935 (8370-35, Remington's Revised Statutes) be and the same hereby is amended to read as follows:

"Section 35. For the purposes of this title:

"(a) The term 'value of the articles used' shall mean the consideration paid or given or contracted to be paid or given by the purchaser to the seller for the article of tangible personal property, the use of which is taxable under this title. The term shall include, in addition to the consideration paid or given or contracted to be paid or given, the cost of transportation by a common carrier. In case the article used is produced or manufactured by the person using the same or is sold under conditions wherein the purchase price, including the cost of transportation, does not represent the true value thereof, the value of the article used shall be determined as nearly as possible according to the retail selling price at place of use of similar products of like quality and character under such rules and regulations as the tax commission may prescribe;

"(b) The terms 'use,' 'used,' 'using' or 'put to use' mean the first use of the article after delivery thereof is completed within this state, and shall include installation, and also storing and withdrawal from storage

for subsequent actual use or consumption within this state;

"(c)   The meaning ascribed to words and phrases in titles I, II and III and all the provisions of titles XVIII, XIX and XX of this act, in so far as applicable, shall have full force and effect with respect to taxes imposed under the provisions of this title [p. 945].  [Rem. Rev. Stat. (Sup.), § 8370-35  (P. C. § 7030-95).]

"Sec. 5.   Section 33 of chapter 180 of Session Laws of 1935 (8370-33, Remington's Revised Statutes) hereby is repealed [p. 946]."   Laws of 1937, chapter 191, p. 943.

The allegations of the complaint, admitted by the demurrer to be true, are summarized as follows:

Respondent, a California corporation, has owned and operated a telephone and telegraph business in the states of Washington, California, Oregon, and a part of Idaho, for many years.   During that time, the respondent has been engaged solely in interstate and intrastate telephone and telegraph commerce and business.   Its interstate and intrastate businesses are inextricably intermingled.   It is impossible for respondent to· operate two telephone and telegraph systems, one for its interstate and the other for its intrastate business.   Its intrastate business in Washington could not be discontinued without a withdrawal from interstate business.   The Washington portion of the respondent's system is connected with its system in Oregon, California and Idaho and with other systems throughout the United States, and by means of this interconnection respondent handles a great number of interstate communications and does a large volume of interstate business.

Respondent purchases from the Western Electric Company, a New York corporation qualified to do business in this state, a large amount of equipment and supplies manufactured and purchased outside of this state and shipped into this state and there used in

the operation, maintenance, and repair of respondent's telephone and telegraph system. These materials and supplies consist of two classes: (1) specific order equipment, and (2) standby material and equipment. "Specific order equipment" is purchased on specific order for installation at a particular place and to serve a particular purpose, such as switchboards, large underground cables, switches, etc., and immediately upon receipt in Washington that equipment is installed and used by the respondent in its telephone plant without any storage in this state prior to installation in respondent's plant.

"Standby material and equipment" consists of private branch exchange switchboards, teletypewriter equipment, cable, loading coils, etc., all especially designed for use in a telephone and telegraph system, and is purchased by respondent outside this state and is shipped to respondent in this state, where it is stored until used in the operation, maintenance, and repair of respondent's telephone system. Reserves of such materials and supplies in this state are necessary to meet the fluctuating demands and emergencies which arise from the variations and changes in the amount and character of public demand for services and also for repairs. The largest part of this equipment, like "specific order equipment," is neither manufactured nor available for purchase by respondent within this state.

It clearly appears that all of the property denominated "specific order equipment" is manufactured specially for use in respondent's intermingled interstate and intrastate business; that it cannot be diverted to any other use, and it undergoes no handling or retention in this state after the termination of its interstate shipment except such as is part of that intermingled interstate and intrastate use. Standby equipment,

which is described above, is held in readiness to replace broken or destroyed equipment, so that respondent may perform its public duty of rendering interstate and intrastate communication without interruption. The purchase price of the chattels purchased by respondent without, and brought into and used in, this state exceeded twenty dollars monthly from May, 1935, to February, 1938, inclusive, and no sales or use tax was paid on that purchase price by respondent either in this state or in any other state.

■ The compensating tax statute clearly indicates the legislative intent to remove discrimination against merchants of this state. It is patent that the taxation of purchases outside this state, when such merchandise is not manufactured, and cannot be purchased, in this state, was not intended. The legislature by the title given to the statute declared that the tax was a compensating tax, which manifestly evinces neither purpose nor intention to tax non-competitor purchases which must be made outside this state.

To "compensate" means to "counterbalance," "make up for," "make amends for." The query, logically following, what does the compensating tax "counterbalance," "make up for," "make amends for," is answered as follows by the administrative officers charged with the enforcement of the statute:

"The primary purpose of the Compensating Tax is to protect the merchants of Washington from discrimination arising by reason of our inability, under Federal Law, to impose a tax upon sales made to our residents by competitive merchants in other states." Washington Tax Commission Circular, E. T. R., No. 1, issued October, 1935.

This construction by the administrative officers is a clear, honest statement of the purpose of the compensating statute, but is no plainer than the language of

the statute expressing the legislative intent. Respecting the above-quoted circular of the tax commission, the author of the opinion in *Northern Pac. R. Co. v. Henneford,* 15 Fed. Supp. 302, aptly said:

"In the absence of this frank declaration, it is plain from the law itself that such is its primary purpose."

It is admitted that the articles purchased by respondent must be imported from without the state, as those articles are not manufactured within this state, nor are they available for purchase by respondent within this state. If, then, as the demurrer admits, there is no non-resident competitive merchant against whom the Washington merchant is protected in sales of this kind, what loss does the Washington merchant sustain which is "made up for" by the tax? How is the Washington merchant benefited by the tax? For what does this tax compensate? The answer is obvious.

On the subject of the purpose of the 1935 compensating tax statute, the United States supreme court, in *Henneford v. Silas Mason Co.,* 300 U. S. 577, 581, 81 L. Ed. 814, 57 S. Ct. 524, said:

"The practical effect of a system thus conditioned is readily perceived. One of its effects must be that retail sellers in Washington will be helped to compete upon terms of equality with retail dealers in other states who are exempt from a sales tax or any corresponding burden. Another effect, or at least another tendency, must be to avoid the likelihood of a drain upon the revenues of the state, buyers being no longer tempted to place their orders in other states in the effort to escape payment of the tax on local sales."

The merchants of this state can not be "helped to compete" with merchants of other states, because the property purchased by respondent outside this state is not manufactured, nor available for purchase, within this state. And manifestly, there can not be even a "likelihood of a drain upon the revenues of the state," by

virtue of temptation to respondent to place its orders in other states in the effort to escape payment of the tax on local sales. Respondent is not *tempted* to make the purchase outside the state. Respondent is *compelled* to buy outside the state, because the articles which it needs to perform its public duty are not produced within this state, nor can they be purchased within this state.

The purchases made by respondent are not purchases which the legislature intended to tax. The statute in unambiguous language clearly expresses the intent and purpose of the legislature—that purpose was so construed by the state tax commissioners, who are charged with the enforcement of the law—to exclude purchases, such as those made by respondent, from imposition of the compensating tax.

We also agree with counsel for respondent that the exaction of the tax imposed by the 1935 statute would be an unlawful burden upon interstate commerce.

The 1935 enactment imposes

". . . a tax or excise for the privilege of using within this state any article of tangible personal property purchased subsequent to April 30, 1935. . . ."

We do not find in Title IV of the act employment of the words "keep," "storage," "withdrawal from storage," "move," and "install." On October 11, 1935, the tax commission promulgated a rule reading as follows:

"Tax liability imposed under the Compensating Tax arises at the time the property purchased is put to use in this state. Property is put to use by the first act after delivery is completed within the state by which the article purchased is actually used or is made available for use with intent, actually to use such property within the state. The term 'made available for use' means and includes the exercise of any right or power over tangible personal property preparatory to actual

use within the state, such as keeping, storing, withdrawing from storage, moving, installing or performing any act by which dominion or control over the property is assumed by the purchaser. Tax Commission Circular E. T. R. No. 1."

The exemption provisions of section 32 of the 1935 revenue act deal with "use" of property by a nonresident, "use" of personal property purchased other than at retail, "use" of property subject to an equivalent tax, and "use" of property less than twenty dollars. No mention is made of "storage," etc., in section 33, which section relates only to "use." Section 34 requires the taxpayer to make a monthly return, showing in detail the quantity of personal property "used" by him within this state during the preceding calendar month. Section 35 defines the term "purchase price" and provides that the price shall include the actual cost of transportation from the place where the article was purchased to the person *using* the same within this state.

The 1935 statute taxes "use" of property. The tax is solely upon "use," and not upon "keeping," "storing," "withdrawing from storage," "moving," and/or "installing" of personal property. It is not valid as a tax upon the use of an instrumentality of interstate commerce. Appellants may not successfully invoke, as authority for the imposition and collection of this tax upon the use of an instrumentality of interstate commerce, the above-quoted rule promulgated by the tax commission. The tax commission had no power to amend the statute.

"The tax commission cannot, by such rule, impose a tax upon property or a transaction that is not mentioned in the statute as taxable. The rule-making power is given only for the purpose of empowering the commission to carry out the provisions of the stat-

ute." *Washington Printing & Binding Co. v. State,* 192 Wash. 448, 73 P. (2d) 1326.

The state of Kentucky imposed a tax of five cents a gallon on all gasoline sold within that state at wholesale. The words "sold at wholesale," as used in the Kentucky statute, were defined to include "any and all sales made for the purpose of resale or distribution or for use," and also to include any person who shall purchase such gasoline without the state of Kentucky "and sell or distribute or use the same within the state." The question of the validity of that tax, as applied to gasoline used to propel a ferry boat engaged in interstate transportation on the Ohio river between Kentucky and Illinois, was decided by the United States supreme court in *Helson v. Kentucky,* 279 U. S. 245, 73 L. Ed. 683, 49 S. Ct. 279. In holding the tax invalid, the court said:

"Plaintiffs in error are engaged in operating a ferry boat on the Ohio River between Kentucky and Illinois. They do an exclusively interstate business. They are citizens and residents of Illinois. Their office and place of business and the situs of all their personal property is in that state. The motive power of the boat is created by the use of gasoline, all of which is purchased and delivered to plaintiffs in error in Illinois. It is stipulated that 75% of this gasoline was actually consumed within the limits of Kentucky, but all of it in the making of interstate journeys. The tax, in question, was computed and imposed upon the use of the gasoline thus consumed.

" . . . The state court of appeals held that the tax was not a property tax, but an excise, and, therefore, the uniformity clause of the state constitution was not involved. The claim under the commerce clause of the federal Constitution was denied on the ground that the tax was confined to gasoline used within the limits of the state and the commerce clause was not affected. It is with the latter question only that we are here concerned.

"Regulation of interstate and foreign commerce is a matter committed exclusively to the control of Congress, and the rule is settled by innumerable decisions of this court, unnecessary to be cited, that a state law which directly burdens such commerce by taxation or otherwise, constitutes a regulation beyond the power of the state under the Constitution. It is likewise settled that transportation by ferry from one state to another is interstate commerce and immune from the interference of such state legislation. *Gloucester Ferry Co. v. Pennsylvania,* 114 U. S. 196, 217; *Mayor of Vidalia v. McNeely,* 274 U. S. 676, 680. The power vested in Congress to regulate commerce embraces within its control all the instrumentalities by which that commerce may be carried on. *Gloucester Ferry Co. v. Pennsylvania, supra,* p. 204. A state cannot 'lay a tax on interstate commerce in any form, whether by way of duties laid on the transportation of the subjects of that commerce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on.' *Leloup v. Port of Mobile,* 117 U. S. 640, 648; *Lyng v. Michigan,* 135 U. S. 161, 166; *Ozark Pipe Line v. Monier,* 266 U. S. 555, 562. While a state has power to tax property having a situs within its limits, whether employed in interstate commerce or not, it cannot interfere with interstate commerce through the imposition of a tax which is, in effect, a tax for the privilege of transacting such commerce. *Adams Express Company v. Ohio,* 166 U. S. 185, 218.

"The following are a few of the cases illustrating the many applications of these principles.

"A state statute imposing a tax upon freight, taken up within the state and carried out of it, or taken up without the state and brought within it, was held, in the *Case of the State Freight Tax,* 15 Wall. 232, to constitute a regulation of interstate commerce in conflict with the Constitution. The court said (pp. 275-276):

" 'Then, why is not a tax upon freight transported from State to State a regulation of interstate transportation, and, therefore, a regulation of commerce among the States? Is it not prescribing a rule for the transporter, by which he is to be controlled in bringing the subjects of commerce into the State, and in taking them

out? The present case is the best possible illustration. The legislature of Pennsylvania has in effect declared that every ton of freight taken up within the State and carried out, or taken up in other States and brought within her limits, shall pay a specified tax. The payment of that tax is a condition, upon which is made dependent the prosecution of this branch of commerce. And as there is no limit to the rate of taxation she may impose, if she can tax at all, it is obvious the condition may be made so onerous that an interchange of commodities with other States would be rendered impossible. The same power that may impose a tax of two cents per ton upon coal carried out of the State, may impose one of five dollars. Such an imposition, whether large or small, is a restraint of the privilege of right to have the subjects of commerce pass freely from one State to another without being obstructed by the intervention of State lines.' . . .

"The statute here assailed clearly comes within the principle of these numerous other decisions of like character which might be added. The tax is exacted as the price of the privilege of using an instrumentality of interstate commerce. It reasonably cannot be distinguished from a tax for using a locomotive or a car employed in such commerce. A tax laid upon the use of the ferry boat, would present an exact parallel. And is not the fuel consumed in propelling the boat an instrumentality of commerce no less than the boat itself? A tax, which falls directly upon the use of one of the means by which commerce is carried on, directly burdens that commerce. If a tax cannot be laid by a state upon the interstate transportation of the subjects of commerce, as this Court definitely has held, it is little more than repetition to say that such a tax cannot be laid upon the use of a medium by which such transportation is effected. 'All restraints by exactions in the form of taxes upon such transportation, or upon acts necessary to its completion, are so many invasions of the exclusive power of Congress to regulate that portion of commerce between the States.' *Gloucester Ferry Co. v. Pennsylvania, supra,* p. 214."

The tax upon the use of gasoline consumed in propelling the boat, the court held, was a tax on an instrumentality of interstate commerce and therefore void. Obviously, the switchboard, etc., are instrumentalities of interstate commerce. The gasoline was the means by which the interstate transportation was conducted. The switchboard is the means by which is carried on the interstate communication.

In *Bingaman v. Golden Eagle Western Lines,* 297 U. S. 626, 80 L. Ed. 928, 56 S. Ct. 624, a statute of New Mexico which imposed an excise tax of five cents a gallon upon the sale and use of all gasoline and motor oil, was held invalid as applied to the purchase of gasoline outside the state of New Mexico, which gasoline was used in propelling within the state of New Mexico the busses of the corporation which was engaged exclusively in interstate commerce. The court said:

"The case turns upon the question whether the pertinent statutory provisions exact a charge as compensation to the state for the use of its highways, or impose an excise tax for the use of an instrumentality of interstate commerce. If the former, the tax should be sustained; if the latter, it clearly contravenes the commerce clause and must be held bad. *Helson and Randolph v. Kentucky,* 279 U. S. 245, and cases cited. The state supreme court has construed the provisions in *Geo. E. Breece Lumber Co. v. Mirabal,* 34 N. Mex. 643; 287 Pac. 699, and *Transcontinental & Western Air, Inc. v. Lujan,* 36 N. Mex. 64; 8 P. (2d) 103; and the court below, rightly concluding that it was bound by this construction, thought that it settled the matter against the validity of the tax. With this view we agree."

In the two cases just considered, the companies were engaged exclusively in interstate business. In principle, however, they are not distinguishable from the case at bar, in which the respondent is engaged in an inextricably intermingled interstate and intrastate

business. In *Cooney v. Mountain States Tel. & Tel. Co.*, 294 U. S. 384, 79 L. Ed. 934, 55 S. Ct. 477, the taxpayer was a telephone company engaged in inextricably intermingled interstate and intrastate business, like the respondent in the case at bar. In the *Cooney* case, the tax imposed was proportioned to the amount of property used in the intermingled interstate and intrastate commerce; that is, two dollars for each telephone instrument used, controlled and operated by the telephone company in the conduct of its business. In the case at bar, the tax is proportioned to the amount of the property used in intermingled interstate and intrastate commerce (two per cent of the purchase price of all property so used plus the cost of transportation). In holding that the tax, as applied to a company furnishing both kinds of service, interstate and intrastate, and employing the same telephone wires, etc., in both as integral parts of its system, was a direct burden on interstate commerce, the court said:

"It appears that in the operation of this unified system, the telephone instruments are the means by which the customers command at their pleasure the service they desire whether intrastate or interstate. And, so far as the instruments are not excepted, the tax is laid indiscriminately with respect to each of these facilities, regardless of the nature of their use.

"There is no question that the State may require payment of an occupation tax from one engaged in both intrastate and interstate commerce. But a State cannot tax interstate commerce; it cannot lay a tax upon the business which constitutes such commerce or the privilege of engaging in it. And the fact that a portion of a business is intrastate and therefore taxable does not justify a tax either upon the interstate business or upon the whole business without discrimination. . . .

"A privilege or occupation tax which a State imposes with respect to both interstate and intrastate business, through an indiscriminate application to in-

strumentalities common to both sorts of commerce, has frequently been held to be invalid. . . .

"The tax, being indivisible and indiscriminate in its application, necessarily burdens interstate commerce."

The Montana tax was a license or occupation tax; that is, Montana taxed the privilege of doing an intermingled interstate and intrastate business. The condemnation of the statute was, of course, because of its "indiscriminate application to instrumentalities common to both sorts of commerce," and as it was "indivisible and indiscriminate" the tax necessarily, the court held, burdened interstate commerce. That case is not distinguishable from the case at bar.

Counsel for appellants insist that a tax upon "use" is not a tax upon an instrumentality of interstate commerce, citing as sustaining authorities *Nashville, C. & St. L. R. Co. v. Wallace,* 288 U. S. 249, 77 L. Ed. 730, 53 S. Ct. 345, 87 A. L. R. 1191; *Edelman v. Boeing Air Transport,* 289 U. S. 249, 77 L. Ed. 1155, 53 S. Ct. 591; and *Coverdale v. Arkansas-Louisiana P. L. Co.,* 303 U. S. 604, 58 S. Ct. 736.

In the first of the authorities cited, an interstate carrier purchased large quantities of gasoline outside the state of Tennessee and brought it into that state in tank cars, from which it was unloaded and placed in the carrier's storage tanks. None of that gasoline was sold by the carrier. All of it was withdrawn and used by the carrier as a source of motive power in interstate rail operations. This storage, however, was a step preliminary to the use of the gasoline in interstate commerce. No one arranged a destination for any part of the gasoline, at the time of the shipment, other than the carrier's storage tanks in Tennessee. While it appeared that, in the usual course of business, a variable and undefined part of it, when segregated for that purpose, would again be transported across

state boundaries, the railroad company "was free to distribute the oil either within or without the state for use in its business or for any other purpose." It is clear from the court's opinion, reading in part as follows, that the decision was predicated upon the above-recited facts:

"Neither the appellant, the shippers, nor the carrier, at the time of the shipment of the gasoline from points of origin, arranged a destination for any part of the oil other than the appellant's storage tanks in Tennessee. Although in the usual course of business a variable and undefined part of it, when segregated for that purpose, would again be transported across state boundaries, appellant was free to distribute the oil either within or without the state for use in its business or for any other purpose. As nothing in the transaction before the withdrawal from storage in Tennessee can be said to have given any ascertainable part of the gasoline a destination to points beyond the state, the case is distinguishable from *Carson Petroleum Co. v. Vial,* 279 U. S. 95, and *Texas & New Orleans R. Co. v. Sabine Tram Co.,* 227 U. S. 111. The oil in storage was not a subject of interstate commerce and so was a part of the common mass of goods within the state, subject to local taxation. *General Oil Co. v. Crain, supra; Susquehanna Coal Co. v. South Amboy, supra; Bacon v. Illinois, supra;* compare *Atlantic Coast Line R. Co. v. Standard Oil Co.,* 275 U. S. 257.

"We cannot say that the tax is a forbidden burden on interstate commerce because appellant uses the gasoline, subsequent to the incidence of the tax, as an instrument of interstate commerce. Taxes said to burden interstate commerce directly when levied upon or measured by the operation of interstate commerce or gross receipts derived from it, are beyond the state taxing power, *East Ohio Gas Co. v. Tax Commission,* 283 U. S. 465, 470; *Sprout v. South Bend,* 277 U. S. 163, 170, 171; *Crew Levick Co. v. Pennsylvania,* 245 U. S. 292, 297, and a tax levied upon the use of gasoline in generating motive power for a ferry boat used exclusively in interstate commerce has been held to be so

direct and immediate a burden on the commerce itself as to be invalid. *Helson v. Kentucky*, 279 U. S. 245.

". . . There can be no valid objection to the taxation of the exercise of any right or power incident to appellant's ownership of the gasoline, which falls short of a tax directly imposed on its use in interstate commerce, deemed forbidden in *Helson v. Kentucky, supra.* Here the tax is imposed on the successive exercise of two of those powers, the storage and withdrawal from storage of the gasoline. Both powers are completely exercised before use of the gasoline in interstate commerce begins. The tax imposed upon their exercise is therefore not one imposed on the use of the gasoline as an instrument of commerce."

In the case at bar, the tax is on use, while in *Nashville, C. & St. L. R. Co. v. Wallace, supra,* the tax is on storage and withdrawal from storage. In the *Nashville* case, the gasoline was not bought as, admittedly, the property in the case at bar was purchased, under a predetermined plan and for the sole, fixed and predetermined purpose of using it in interstate commerce. The *Nashville* case was distinguished from *Helson v. Kentucky,* 279 U. S. 245, 73 L. Ed. 683, 49 S. Ct. 279, for the reason that, in the *Helson* case, the tax was imposed directly on the use, while in the *Nashville* case the tax was imposed only upon the storage and withdrawal from storage, and the gasoline, when so withdrawn, might be used by the carrier either inside or outside the state for the carrier's business or for any other purpose.

In *Edelman v. Boeing Air Transport,* 289 U. S. 249, 77 L. Ed. 1155, 53 S. Ct. 591, the administrative officers of Wyoming construed a statute similar to the Tennessee statute to make it applicable merely to storage and withdrawal from storage. In accepting the administrative construction, the United States supreme court held that the Wyoming statute was identical in operation with that sustained in *Nashville, C. & St. L. R. Co.*

*v. Wallace, supra.* We are convinced, reading the opinion as a whole, that the Wyoming statute would have been held unconstitutional under the authority of *Helson v. Kentucky, supra,* except for the administrative construction and application of the statute by the state officials in applying its provisions to the appellant. As stated in *Northern Pac. R. Co. v. Henneford,* 15 Fed. Supp. 302,

"In the course of the opinion Mr. Justice Stone said:

" 'A state may validly tax the "use" to which gasoline is put in withdrawing it from storage within the state, and placing it in the tanks of the planes, notwithstanding that its ultimate function is to generate motive power for carrying on interstate commerce. Such a tax cannot be distinguished from that considered and upheld in *Nashville, Chattanooga & St. Louis Ry. v. Wallace, supra.* There it was pointed out that "there can be no valid objection to the taxation of the exercise of any right or power incident to . . . ownership of the gasoline, which falls short of a tax directly imposed on its use in interstate commerce, deemed forbidden in *Helson v. Kentucky,* 279 U. S. 245, 49 S. Ct. 279, 73 L. Ed. 683." As the exercise of the powers taxed, the storage and withdrawal from storage of the gasoline, was complete before interstate commerce began, it was held that the burden of the tax was too indirect and remote from the function of interstate commerce, to transgress constitutional limitations.

" 'Despite the fact that the statute as applied is identical in operation with that sustained in *Nashville, Chattanooga & St. Louis Ry. v. Wallace, supra,* respondent contends that as the statute is written, the tax is one on the consumption of gasoline in propelling its airplanes in interstate commerce, invalid under *Helson v. Kentucky, supra.* In that case a Kentucky statute taxing the use of gasoline was applied to that purchased and placed in the tanks of a ferry boat outside the state for use in operating it in interstate commerce. The tax, which was levied only with respect to the gasoline con-

sumed while the ferry boat was within the state, was held to be invalid as, in effect, a direct tax on the privilege of carrying on interstate commerce.

" 'But the officers of Wyoming, charged with the enforcement of the taxing statute, are giving no such application to it as was given to that in *Helson v. Kentucky, supra,* and it is not suggested that they will. All that has been done or threatened by them, under their interpretation of the statute, infringes no constitutional right of the complainant. In the circumstances, no case is presented, either by pleadings or proof, calling on a federal court of equity to rule upon the correctness of some other construction which may never be adopted by the state administrative officials or by the state courts.'

"The thought underlying the language used in the last two sentences of the last foregoing quotation is that a court of equity will not interfere in behalf of a complainant whose rights have not been violated or threatened and that no court will undertake to decide hypothetical cases which may never arise. Taking the opinion as a whole, it is crystal clear that but for the administrative construction and application of the statute by the state officials in applying its provisions to the complainant, the Wyoming statute would have been held as unconstitutional under the authority of *Helson v. Kentucky.* Since as actually construed and applied, the tax was upon one only of the incidents of ownership of property, viz., its withdrawal from storage, the case, in practical effect, was the same as that presented under the statute involved in *Nashville, Chattanooga & St. Louis Ry. Co. v. Wallace, supra,* the court treated the Wyoming statute as though it has been worded precisely as it had been construed and enforced by the administrative officers, and refused to speculate upon what might be done in the future for the reason that no case presenting such imaginary construction or application had been made either by pleadings or proof, and no threat to change the administrative construction of the act had been made. The whole effect of the opinion in the *Edelman* Case is that the actual and practical application of the statute to the complainant saved the statute from vulnerability to constitu-

tional attack, because as so applied and construed no constitutional right of the complainant had been invaded, and as there was no threat to apply the statute in any other way the court confined itself to the manner of its past actual application and construction. The plain inference to be drawn from the *Edelman* Case is that if the statute had been construed as it was written instead of as it had been applied to the complainant in that case it would have been obnoxious to the commerce clause of the Federal Constitution."

The *Edelman* case, like the *Nashville* case, has to do with the application of a tax only to storage or withdrawal from storage. It was not, as in the case at bar, a tax upon the use of an instrumentality of interstate commerce.

*Coverdale v. Arkansas-Louisiana P. L. Co.*, 303 U. S. 604, 58 S. Ct. 736, involves a license tax passed by the state of Louisiana. Section 3 of the statute provides that every person engaged within the state in any business who uses in the conduct of that business an electrical or mechanical power of more than ten horsepower shall pay a tax of one dollar per annum for each horsepower of capacity of the machinery or apparatus known as the "prime mover" or "prime movers" operated by such person. The complaining taxpayer in that case owned twelve gas-burning engines, which were connected to certain compressors, which in turn were connected with pipe lines through which that particular taxpayer transported natural gas from Louisiana to Texas and Arkansas. The court held that the action was a pure revenue measure, and that a tax upon the use of these gas engines, which produced power, which in turn operated compressors, which compressors in turn forced natural gas to move in interstate commerce through a pipe line, fell upon a process separate from the interstate transportation of the gas. The court found that the situation was analogous to

that discussed in *Utah Power & Light Co. v. Pfost,* 286 U. S. 165, 76 L. Ed. 1038, 52 S. Ct. 548, where

"A difference was perceived between the conversion of the mechanical energy of falling water into electrical energy and the transportation of the latter."

Nothing in *Coverdale v. Arkansas-Louisiana P. L. Co., supra,* militates against the force of *Helson v. Kentucky,* 279 U. S. 245, 73 L. Ed. 683, 49 S. Ct. 279, and *Cooney v. Mountain States Tel. & Tel. Co.,* 294 U. S. 384, 79 L. Ed. 934, 55 S. Ct. 477, is clear from the court's language in the *Coverdale* opinion, as follows:

"*Helson v. Kentucky,* 279 U. S. 245, 49 S. Ct. 279, 73 L. Ed. 683; *State Tax Commission v. Interstate Natural Gas Co., Inc.,* 284 U. S. 41, 52 S. Ct. 62, 76 L. Ed. 156; and *Cooney v. Mountain States T. & T. Company,* 294 U. S. 384, 55 S. Ct. 477, 79 L. Ed. 934, are pressed upon us as controlling authorities for the invalidation of the tax. We think they belong to the category of cases which construe the state tax acts involved as taxes on interstate commerce and its instrumentalities rather than on operations closely connected with but distinct from that commerce. In the *Interstate* Case and the *Cooney* Case taxes levied on the business of engaging in interstate commerce were held invalid. Likewise, in the *Helson* Case, this Court concluded that the tax on gasoline brought into the state and used on an interstate ferry was analogous to a tax on the use of the ferry itself in transit and therefore within the rule prohibiting state taxes on commerce."

We agree with the argument of counsel for respondent that, if a tax on the use of gasoline employed in propelling a ferry boat is a tax upon an instrumentality of commerce, and one which falls directly upon the use of one of the means by which commerce is carried on, and is a direct burden upon that commerce, and such tax is a restraint upon "acts necessary to the completion" of that commerce, then the switchboards,

cables, wires, and other plant and equipment of the respondent, all of which are absolutely essential to the carrying on of interstate communication, are instrumentalities of interstate communication or commerce, and that the taxing of the use of such instrumentalities is to lay a direct burden upon interstate commerce.

In *Coverdale v. Arkansas-Louisiana P. L. Co.*, 303 U. S. 604, 58 S. Ct. 736, the United States supreme court did not overrule *Puget Sound Stevedoring Co. v. Tax Commission*, 302 U. S. 90, 58 S. Ct. 72, in which the court held that the process of loading vessels which transported cargó in interstate or foreign commerce was so indispensable to such interstate or foreign commerce as to be a part of it, and therefore that a tax attempted to be levied by this state on the business of the stevedoring company so engaged was in violation of the commerce clause, whether that loading was done by the crew of the vessel or by a stevedoring company engaged solely in the business of loading and unloading vessels.

So, too, the use of standby equipment, which is described above, is a use in the intermingled interstate and intrastate service in which respondent is engaged, and is a vital part of that business. Such equipment is dedicated to that use from the time of purchase and does not undergo any storage between ending of interstate shipment and dedication to that use. Any keeping or retention of that equipment within this state was and is an inseparable part of its use in respondent's intermingled interstate and intrastate commerce. This equipment must be purchased and kept at strategic points, so that respondent may promptly perform and discharge, with as little interruption as possible, its obligation to the public as a common carrier of interstate and intrastate communication. Clearly, the

standby equipment does not come within the rule announced in cases like *Nashville, C. & St. L. R. Co. v. Wallace,* 288 U. S. 249, 77 L. Ed. 730, 53 S. Ct. 345, 87 A. L. R. 1191.

Nor can we agree with the attorney general that if, under the 1935 act, a tax is invalid as a direct burden on interstate commerce, the decree in this case is too broad in enjoining the appellants from enforcing the 1937 amendatory act so far as standby equipment is concerned. The admitted facts as to standby equipment are that it is purchased with operating capital by respondent, which has no business other than an intermingled interstate and intrastate business, with the sole, fixed and predetermined purpose of using it in that business. That equipment is necessary in the conduct of that business, and by reason of its special nature it is not and cannot be diverted to any other use. It is wholly devoted, dedicated, and set apart exclusively for use and is, in fact, used in such intermingled interstate and intrastate use, and in no other use. It is accounted for under rules and regulations prescribed by Federal authority, and from the time of its purchase is a part of respondent's telephone and telegraph system and an instrumentality devoted to the operation of respondent's telephone and telegraph business.

Manifestly, under these admitted facts, *Nashville C. & St. L. R. Co. v. Wallace,* 288 U. S. 249, 77 L. Ed. 730, 53 S. Ct. 345, and *Edelman v. Boeing Air Transport,* 289 U. S. 249, 77 L. Ed. 1155, 53 S. Ct. 591, are inapplicable as to standby equipment. In neither of those cases does it appear that only such quantities of gasoline were maintained as were, from time to time, necessary for the efficient operation of the interstate business. The reading of each of the opinions will disclose the contrary.

It would unnecessarily extend this already overlong opinion to review all of the authorities cited. Our examination of those authorities discloses they are either not in point or are in harmony with this opinion.

The judgment is affirmed.

STEINERT, C. J., MAIN, HOLCOMB, BEALS, GERAGHTY, ROBINSON, and SIMPSON, JJ., concur.

BLAKE, J. (dissenting)—Stripped of argumentation and legal conclusions, the complaint sets forth only the following *ultimate* facts: Plaintiff is a California corporation, engaged in the operation of telephone systems in the states of California, Oregon, Washington, and Idaho. The system in Washington is connected with those of California, Oregon, and Idaho. Plaintiff handles a great number of interstate communications. Gross revenues of interstate service in this state are approximately one-fourth of the whole of the operating revenues within the state. The plant facilities are devoted indiscriminately to intrastate and interstate service. Plaintiff purchases outside this state a great amount of equipment, apparatus, material, and supplies, which are brought into the state and used in the operation, maintenance, and repair of its telephone and telegraph system. Some of the plant equipment is ordered for immediate use, and is installed without previous storage within the state. Some equipment is brought into the state and put in storage for future use, as necessity requires.

Unadorned by legal supplementation, the statute (Laws of 1935, chapter 180, title IV, p. 726, as amended by Laws of 1937, chapter 191, p. 943) simply provides that there shall be collected, for the privilege of "using within this state any article of tangible personal property," a tax of two per cent of the value of such property. The only limitations upon the collection of such

tax to be found in the statute are the following: (1) The incidence of the tax shall not fall upon property purchased, produced, or manufactured outside this state until the transportation of such article has finally ended or until such article has become commingled with the general mass of property of this state. (2) The tax shall not apply to the use of tangible property of a nonresident temporarily within the state. (3) The tax shall not apply to property which would be exempt from the sales tax (Laws 1935, chapter 180, title III, p. 721). (4) The tax shall not be collected on property if it has already been subjected to tax under title III, and such tax has been paid. (5) The tax shall not apply to the use of tangible personal property put to use during any bi-monthly period, the total value of which is less than fifty dollars. (6) The tax shall not apply to the use of rolling stock or aircraft or floating equipment of a common carrier, the first use of which within the state is actual use in conducting interstate or foreign commerce.

By its decision in this case, however, the court has supplemented the act with another proviso: If the property purchased outside the state is not manufactured or procurable in the open market in this state, the tax shall not apply. I think it is not open to dispute to say that there is nothing in the act itself which warrants such an inference of legislative intent. It is not in the mouth of plaintiff to assert that the tax commission has so construed the act, when plaintiff is here to enjoin the commission from collecting the tax on property falling within that category. Nor, assuming that the tax commission has promulgated regulations from which such interpretation can be deduced, should the court adopt that interpretation in face of the plain terms of the act. The general rule is that the court will not follow administrative interpretation of a stat-

ute in contravention of its plain terms. *Wendt v. Industrial Ins. Commission,* 80 Wash. 111, 141 Pac. 311; *State ex rel. Sherman v. Benson,* 111 Wash. 124, 189 Pac. 1000; *State v. Davies,* 176 Wash. 100, 28 P. (2d) 322.

Of course, if the supplementation of the statute by this decision is to be accepted as valid judicial interpretation and construction, the case ends right here. For the supreme court of the United States accepts as binding upon it the construction placed upon a state statute by the court of last resort of the state. Thus, the real question in this case will probably never be considered by that court. Nevertheless, I feel impelled to briefly discuss the question of whether or not the tax enjoined constitutes a direct burden on interstate commerce.

In approaching the question, we should bear in mind that it is a cardinal principle of statutory interpretation that the court will construe an act so as to render it valid and effective, unless it clearly offends some constitutional inhibition. The presumption is that a statute is valid. With Federal courts, the presumption is indulged primarily in favor of acts of Congress; with a state court, the presumption is accorded to the statute of the state. These rules are so well established that I would not mention them, did they not hold peculiar interest and significance for us in the decision of this case.

For the only decision of authoritative weight, involving the exact question here presented, was recently handed down by a three-judge United States district court. *Southern Pac. Co. v. Corbett,* 23 Fed. Supp. 193. The court in that case, upon facts similar to those set up in the complaint in this case, sustained a tax, in no essential respect different from our compensating

tax, holding that the tax did not constitute a direct burden upon interstate commerce.

In view of this decision, and in view of the decision of the supreme court of the United States holding our compensating tax a valid exercise of the state's power of taxation (*Henneford v. Silas Mason Co.*, 300 U. S. 577, 81 L. Ed. 814, 57 S. Ct. 524), I think the statute should be accorded the presumption of validity by this court upon the facts set up in the complaint in this case.

I dissent.